IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| United States of America, | No. cr-10-2887 -TUC-RCC [CRP] |
|---|---|
| Plaintiff, | **REPORT AND RECOMMENDATION** |
| vs. | |
| Jesus Francisco Gomez, | |
| Defendant. | |

Pending before the Court is Defendant's Motion to Suppress Physical Evidence and Statements. (Doc. 31). The Court held an evidentiary hearing on Tuesday, September 6, 2011 and continuing on Monday, September 12, 2011. (Docs. 61, 67). Based on the evidence heard, the Magistrate Judge recommends Defendant's Motion be DENIED.

**Factual Findings**

This case arises from the stop of Defendant's vehicle during which Border Patrol agents discovered a significant quantity of marijuana in a hidden compartment under the bed of Defendant's truck. Defendant contends agents lacked reasonable suspicion to stop his vehicle; he further contends agents should have secured a search warrant prior to prying open the bed of his truck to see the marijuana.

On September 25, 2010, Border Patrol Agent Cody Adams and his partner

initiated a stop of Defendant's vehicle. At the time, Defendant was driving westbound on Forest Service Road ("FSR") 61. Agent Adams described FSR 61 as a "windy mountainous [dirt] road" in a "very remote area near the border." (Transcript of Evidentiary Hearing, 9/6/11, Doc. 66, ("TR 1"), pp. 12, 13).

During his five-year Border Patrol career, Agent Adams has worked at the Sonoita Border Patrol station. When Agent Adams initiated the stop of Defendant on FSR 61, he had been working that specific area of the Patagonia Mountains for the previous six months on a special detail team called Border Awareness Intelligence Team ("BAIT"). Agent Adams was, therefore, very familiar with the area, the local vehicles that travel on FSR 61, and the illegal smuggling that occurs with frequency on that road. Prior to stopping Defendant, Agent Adams had seized small trucks in the area that were used for smuggling illegal narcotics. (Transcript Day 2 of the Evidentiary Hearing, Monday, September 12, 2011, Doc. 71 ("TR 2"), p. 25).

Agent Adams initially became suspicious of Defendant because he recognized Defendant as a person he had observed four days earlier involved in suspicious activity. On September 21, 2010, on FSR 61, a few miles from where Agent Adams stopped Defendant on September 25 and around the same time in the morning, Agent Adams encountered Defendant driving a different small truck. At that time, Agent Adams was en route to investigate suspected smuggling activity. Defendant was driving westbound on FSR 61. Agent Adams, who was headed eastbound, pulled his Border Patrol vehicle off to the side of the road to allow Defendant's vehicle to pass. As the road is very narrow, Defendant's vehicle passed within an arm's distance of Agent Adams' vehicle. Agent Adams testified that he could have touched Defendant's vehicle as it passed. As Defendant slowly drove his vehicle past the agent's vehicle, Agent Adams was able to get a close, detailed look at Defendant.

Agent Adams noticed and remembered Defendant for a number of reasons. Defendant was not one of the locals with whom Agent Adams was familiar. Defendant

was driving a small white Dodge Dakota truck with some paint missing above the windshield. The small truck was suspicious because Agent Adams did not recognize it as being a vehicle owned by one of the locals and because smaller trucks are often used in that area to cross the international boundary as traffickers must ramp the vehicles over a border fence. (TR 1, p. 17). Agent Adams also noticed the truck Defendant was driving had a newer license plate on an older model vehicle, which in Agent Adams experience is common with drug smuggling. Because of the many suspicious facts about Defendant, Agent Adams wrote down the license plate of Defendant's vehicle. He then continued driving into the mountains to go investigate the suspected smuggling activity for which he was en route.

Later that afternoon, Agent Adams arrived back at the Sonoita Border Patrol station. Once there, he recognized the white Dodge Dakota truck sitting in the seizure area of the station. (TR 1, p. 18). Agent Adams referenced the license plate and it was the same vehicle. Agent Adams also knew it was the same truck he had seen on FSR 61 because the paint was missing above the windshield. The person arrested driving the vehicle was not Defendant. The driver told agents he had picked the vehicle up from another driver before driving it through a Border Patrol checkpoint. The vehicle had been seized at Border Patrol's State Route 83 checkpoint. Agents discovered an after-market manufactured compartment on the vehicle which concealed marijuana. At that point based on his training and experience as a Border Patrol agent, Agent Adams concluded that Defendant had likely been trafficking marijuana when Agent Adams encountered him on FSR 61 earlier in the day.

Because of the September 21, 2010 incident when Agent Adams again saw Defendant four days later on the same road, FSR 61, at approximately the same location and time, he was immediately suspicious of Defendant. As Agent Adams approached Defendant's vehicle, he immediately recognized Defendant as the driver of the white Dodge Dakota. Agent Adams was again approaching Defendant's vehicle slowly as

Agent Adams was traveling in the opposite direction of Defendant.

On this occasion, Defendant was driving another older model small truck, a Toyota T-100. After Defendant passed Agent Adam's vehicle, Agent Adams turned his vehicle around and began following Defendant. Like the white Dodge Dakota, Defendant's Toyota T-100 had a newly registered license plate, a fact Agent Adams associates with possible criminal activity. The fact that Defendant was driving another older model small truck was also suspicious. A vehicle registration check showed the vehicle was licensed to a female who lived in Nogales, not in the immediate area. The registration check also showed the female had made multiple southbound entries into Mexico with multiple plates and multiple vehicles. Agent Adams testified that it is suspicious when vehicles in that area come back registered to people who did not live in the area as this is a remote area with very little traffic, and most of that legal traffic is locals. Further, in Agent Adams experience, a vehicle registered to an owner with multiple entries into Mexico in multiple vehicles with multiple plates is often associated with criminal activity.

As Agent Adams was following Defendant's truck he also testified that he noticed the rear end of the vehicle bouncing more than normal as it traveled along the washboard dirt road and that Defendant appeared nervous.

After following Defendant's vehicle for a short distance, Agent Adams initiated a stop of Defendant's vehicle. Defendant yielded. This stop occurred around 8:20 a.m or 8:25 a.m. (TR 2, p. 16). Agent Adams exited his vehicle and approached Defendant's vehicle to talk with him. After Defendant told Agent Adams he was an American citizen and presented him with identification, Defendant told Agent Adams that he was coming from a ranch but he could not recall which ranch. He also told Agent Adams that he was looking for his daughter to fix her car. Agent Adams observed there were no tools in the cab of the truck or in the bed of the truck. (TR 1, p. 34). Agent Adams further observed that Defendant seemed nervous and took a long time to answer the agent's questions, as if

he was thinking about how to answer the questions. When asked if he owned the vehicle, Defendant told Agent Adams the vehicle belonged to an acquaintance he had met at a bar in Nogales, Arizona. This was suspicious to Agent Adams as in his experience it is common for drug smuggling organizations to recruit drivers for load vehicles in local bars. (TR 1, p. 35).

Agent Adams then asked Defendant for consent to search the vehicle. Agent Adams testified that he received Defendant's verbal consent. Defendant testified that he gave consent to search the interior cab of the truck but not dismantle the bed of the truck. (TR 2, p. 73). Upon a visual inspection of the vehicle, Agent Adams could tell there was a significant hidden space between the tire and the top of the wheel well in the bed of the truck. (TR 1, p. 36). In Agent Adams experience, this space is consistent with a hidden compartment. Further, Agent Adams noticed that part of the truck was spray-painted black and did not match the original black paint of the truck. Agent Adams also noticed a caulking filler consistent with Bondo, which is frequently used by drug smugglers to conceal hidden compartments. The back of the truck also looked larger than a normal bed of a truck and suggested to Agent Adams the presence of a hidden compartment. Agent Adams also noticed Defendant did not have any personal items in the truck, which to him is indicative of smuggling.

Prior to calling the K-9 officer, Agent Adams ran a check on Defendant and learned Defendant had previous convictions for marijuana and alien smuggling. Agent Adams' partner then requested a K-9 officer. The call logs and testimony showed this call was made within a couple of minutes of the initial stop. (TR 2, pp. 15, 30). The K-9 officer immediately responded and said he was traveling from State Route 83 checkpoint, which was approximately 30 to 40 minutes away. (TR 2, pp. 11, 42). Agent Adams believes the K-9 officer arrived around 9:00 a.m. The canine alerted on Defendant's vehicle almost immediately. (TR 2, p. 44). Agent Adams called dispatch at 9:09 a.m. to inform dispatch that the dog alerted on the vehicle. (TR 2, p. 15). Defendant testified that

it was an hour and a half from the time agents stopped his vehicle to the time the K-9 unit arrived on the scene. (TR 2, p. 75). This testimony is controverted by the dispatch call records and the credible testimony of the Border Patrol agents.

After the canine alerted, Defendant was then placed under arrest and read his *Miranda* rights. Also after the canine alerted, Agent Adams used a screwdriver to break the seam on the caulking above the tailgate. Peering into the hidden compartment, Agent Adams observed small bundles that smelled like marijuana. Agents transported Defendant to the Sonoita Border Patrol station and Agent Adams drove Defendant's vehicle to the station. Once at the station, around 10:05 a.m. the truck was x-rayed by a Border Patrol agent. (TR 2, pp. 60, 65). Eventually, bundles of marijuana were removed from the hidden compartment in Defendant's vehicle, Defendant waived his right to an attorney and gave an incriminating statement.

## **Analysis**

The first issue raised by Defendant is whether the agents had reasonable suspicion to stop his vehicle. The Fourth Amendment prohibits an officer from stopping a vehicle without a reasonable suspicion of criminal conduct at the time of the stop. *United States v. Rodriguez*, 976 F.2d 592, 594 (9th Cir.1992), opinion amended on denial of rehearing by 997 F.2d 1306 (9th Cir.1993). Reasonable suspicion exists when an officer is aware of specific, articulable facts, which together with objective and reasonable inferences, form a basis for suspecting that the particular person to be detained has committed or is about to commit a crime. *United States v. Salinas*, 940 F.2d 393, 394 (9th Cir.1991). The determination of whether reasonable suspicion exists must be based on "the totality of the circumstances - the whole picture." *United States v. Cortez*, 449 U.S. 411, 417 (1981). The facts are to be interpreted in light of a trained officer's experience, and the whole picture must be taken into account. *United States v. Sokolow*, 490 U.S. 1, 8 (1989).

In this case, the stop was replete with reasonable suspicion. To begin, on

September 25, 2010, when Agent Adams saw Defendant, he remembered Defendant from the incident four days earlier. Agent Adams knew the vehicle Defendant had been driving on September 21, 2010 was eventually found to be carrying marijuana in a hidden compartment. Now four days later, Defendant was driving another small truck in the same remote location around the same time as he was on September 21, 2010. This truck, like the truck from September 21, was an older model vehicle with a newer license plate. Agent Adams finds it common for drug smugglers to use older vehicles that have recently registered license plates.

Further, Agent Adams did not recognize the small truck as one of the vehicles driven by locals who lived in the area. Agent Adams was familiar with the vehicles driven by the locals as he had worked in this focused location for the previous six months. Also, small trucks in this remote area are suspicious because Agent Adams knows such vehicles are often used by smugglers because they can be ramped over the border fence that exists in that area. Finally, the registration check revealed the truck was registered to a woman in Nogales who had multiple southbound entries into Mexico in different vehicles with different license plates. Agent Adams testified the use a vehicle registered to a person who lives out of the area as well as to a person who has multiple entries into Mexico with different vehicles and license plates is also common in drug smuggling. All of the facts led Agent Adams to reasonably infer Defendant was trafficking illegal narcotics. Agent Adams developed the reasonable suspicion necessary to initiate a stop of Defendant's vehicle.

While not arguing it explicitly, Defendant also suggests in his Motion that agents detained him longer than necessary to bring out the canine unit to conduct a drug sniff of his vehicle.[1] "[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 500

---

[1] When the Motion was filed, Defendant had requested but not yet received the radio logs to determine when the canine unit was called and when the canine alerted on the vehicle.

- 7 -

(1983) (plurality). Law enforcement must diligently pursue their investigation. *United States v. Sharpe*, 470 U.S. 675, 685 (1985) (internal citation omitted). In deciding how long is too long for a stop, courts consider "the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes." *Id*. (internal citations omitted).

In *United States v. Sharpe*, the Supreme Court held that a 20-minute vehicle detention was a reasonable *Terry* stop where officers diligently pursued their investigation and where the delay was due almost entirely to the evasive actions of the defendant. 470 U.S. at 687-88. In contrast, the Supreme Court held in *United States v. Place* that a 90-minute detention of luggage was an unreasonable investigatory stop where the officers did not call a drug dog until after defendant's plane had arrived even though officers knew of the defendant's scheduled arrival at the airport, had ample time to plan ahead, and had opportunities to minimize the intrusion on his Fourth Amendment interests. 462 U.S. 696, 709-710 (1983) (finding that in addition to the officer's lack of diligence, a 90-minute seizure is sufficient to transform an investigatory stop into an arrest although there is no technical time limitation for a permissible *Terry* stop).

The agents in the case before this Court diligently pursued their investigation and held Defendant no longer than necessary to determine whether he was trafficking illegal narcotics. As the time logs and testimony showed, Defendant was stopped around 8:20 or 8:25 a.m. Within minutes of stopping Defendant's vehicle, Agent Adams' partner requested a canine unit. The canine officer immediately responded and began the 30 to 40 minute drive out to the remote location on FSR 61. By 9:09 a.m., less than an hour after the initial stop, Agent Adams was informing dispatch that the canine had alerted on Defendant's vehicle. There is no evidence that any of the agents delayed in pursuing the investigation. Fifty minutes to stop a suspect, request a canine, have the canine unit drive to a remote location, and conduct the canine sniff of the vehicle is not an unreasonable amount of time. In fact, to accomplish so much of the investigation in such a relatively

short period of time when the location is remote shows the agents were diligent.

Defendant also contests agents' removal of caulking and a plate used to hide the hidden compartment as well as their use of a screwdriver to pry up part of the truck bed. Agents removed the caulking and plate and pried up part of the truck bed after the canine alerted to the presence of narcotics in a hidden compartment under the bed of the truck. Defendant argues after the canine alerted to the presence of narcotics, agents were obligated to get a search warrant before dismantling any part of the truck. Defendant is incorrect.

If a drug detection dog alerts for the presence of illegal narcotics, that alert provides probable cause to conduct a warrantless search pursuant to the automobile exception to the warrant requirement. *United States v. Garcia*, 205 F.3d 1182, 1187 (9th Cir.2000) (citing *United States v. Ross*, 456 U.S. 798, 807 (1982). If officers have probable cause to believe that the vehicle contains evidence of a crime, the officers may lawfully conduct a warrantless search of the entire vehicle and its contents. *Ross*, 456 U.S. at 825. An officer has probable cause to search if, in the totality of the circumstances, "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

Here, the canine alerted to the presence of narcotics in a hidden compartment under the bed of the truck. The agents, thus, had probable cause to search the entire vehicle. It is also worth noting that prior to the search, Agent Adams made multiple observations leading him to suspect the vehicle contained a hidden compartment including observing a significant hidden space between the tire and the top of the wheel well in the bed of the truck, noticing that part of the truck was spray-painted black and did not match the original black paint of the truck, noticing a caulking filler consistent with Bondo, and observing that the back of the truck looked larger than a normal bed of a truck. The canine alert further confirmed the agents' suspicions that the vehicle contained illegal narcotics and gave them, if they did not have it already, probable cause to search

Defendant's entire vehicle. Agents use of a screwdriver to pry open a panel and part of the truck bed to reveal the hidden compartment under the bed of the truck did not exceed their authority to search the entire vehicle.

Defendant's reliance on *Arizona v. Gant*, 556 U.S. 332 (2009) is misplaced. *Gant* addressed the limits of law enforcement's right to search a vehicle *incident to a recent occupant's lawful arrest*. *Gant*, 556 U.S. at 1714. In *Gant*, the defendant was arrested for driving with a suspended license. *Id*. He was arrested outside of but near his vehicle. The officers did not have reason to suspect the vehicle contained any evidence related to the defendant's arrest for a suspended license. They searched the vehicle simply because the defendant was under arrest and was a recent occupant of the vehicle. Clarifying its ruling in *New York v. Belton*, 453 U.S. 454 (1981) and affirming its prior ruling in *Chimel v. California*, 395 U.S. 752 (1969), the Court found police may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of the arrest. *Gant*, 556 U.S. at 1723.

In the case before this Court, the vehicle was searched because a drug detection canine alerted to the presence of illegal narcotics in the vehicle. Therefore, Defendant's vehicle was searched pursuant to the automobile exception to the warrant requirement. It was searched because agents suspected the vehicle itself contained the evidence of the crime.

**Recommendation**

The Magistrate Judge recommends the District Court, after independent review, DENY Defendant's Motion to Suppress Physical Evidence and Statements. (Doc. 31).

Pursuant to Federal Rule of Criminal Procedure 59(b)(2), any party may serve and file written objections within fourteen days of being served with a copy of the Report and

Recommendation. If objections are not timely filed, they may be deemed waived. The parties are advised that any objections filed are to be identified with the following case number: **CR 10-2887-RCC**.

Dated this 11th day of October, 2011.

CHARLES R. PYLE
UNITED STATES MAGISTRATE JUDGE